[Cite as *In re G.S.*, 2025-Ohio-2859.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| G.S. (DOB 05/07/2023) | : | Hon. William B. Hoffman, P.J. |
| Z.S.  (DOB 05/09/2024) | : | Hon. Andrew J. King, J. |
|  | : | Hon. Robert G. Montgomery, J. |
|  | : |  |
|  | : |  |
|  | : | Case Nos. 2025CA00012 |
|  | : | 2025CA00013 |
|  | : |  |
|  | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas, Family Court Division, Case Nos. 2023JCV01192 and 2024 JCV00504


JUDGMENT:     Affirmed


DATE OF JUDGMENT:     August 13, 2025


APPEARANCES:

For Plaintiff-Appellant

RICHARD D. HIXSON
3808 James Court
Suite 2
Zanesville, OH  43701

For Defendant-Appellee

BRANDON J. WALTENBAUGH
402 2nd Street SE
Canton, OH  44702

*King, J.*

{¶ 1}   Appellant Father appeals January 23, 2025 judgment of the Stark County Juvenile Court awarding permanent custody of his children, G.S. and Z.S., to the Stark County Department of Job and Family Services ("SCJFS"). We affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

{¶ 2}   On October 20, 2023, SCJFS filed a complaint for the temporary custody of G.S. born May 2023 alleging dependency/neglect. The trial court granted emergency custody to SCJFS and directed Father to complete several pre-adjudicatory orders. Initial concerns were the intellectual challenges of both parents, mental health issues with both parents, and their inability to care for G.S. who was born 13 weeks premature. G.S. had significant medical challenges which neither parent appeared equipped to handle despite repeated instruction by hospital staff. The same day, following an emergency shelter care hearing, the trial court granted temporary custody of G.S. to SCJFS.

{¶ 3}   On January 3, 2024, the trial court found G.S. to be dependent and placed the child into the temporary custody with SCJFS.

{¶ 4}   On May 13, 2024, SCJFS filed a complaint for the temporary custody of Z.S. born May 9, 2024 alleging dependency/neglect. Parents had not informed anyone involved in G.S.'s case that mother was pregnant. Z.S. was also born prematurely and was in neonatal intensive care when the complaint was filed. Concerns again involved parent's limited intellectual functioning, mental health challenges, and inability to care for Z.S.

{¶ 5}   Case reviews were held on January 19, 2024, June 21, 2024, and December 19, 2024. On September 24, 2024, the trial court extended the temporary

custody of the children for an additional six months. On November 12, 2024, SCJFS filed a motion seeking permanent custody of G.S. and Z.S.

{¶ 6}   On January 16, 2025, the trial court held a hearing on the permanent custody motions. By judgment entry filed January 23, 2025, the trial court terminated all parental rights and granted permanent custody of the children to SCJFS.

{¶ 7}   Father filed an appeal raising the following errors:

I

{¶ 8}   "THE TRIAL COURT ERRED IN FINDING THAT G.S. AND Z.S. CANNOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME NOR SHOULD THE CHILDREN BE PLACED WITH THEM."

II

{¶ 9}   "THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN."

III

{¶ 10} "THE TRIAL COURT ERRED IN DETERMINING THAT STARK COUNTY JOB AND FAMILY SERVICES MADE REASONABLE EFFORTS."

{¶ 11} Because Father's arguments are interrelated, we address them together. Father argues the trial court erred in finding the children could not be placed with him within a reasonable time, that permanent custody was in the children's best interests, and that the SCJFS made reasonable efforts to reunite Father with his children.[1] He argues the court erred in reaching all three of these conclusions because he was not referred to the intensive in-class Goodwill Parenting program. We disagree.

---

[1] Mother has not filed an appeal.

Applicable Law

{¶ 12} R.C. 2151.414(B)(1) states permanent custody may be granted if the trial court determines, by clear and convincing evidence, that it is in the best interest of the child and any of the following apply:

> (a) The child is not abandoned or orphaned . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ....
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 13} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. See *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985). 'Where the degree of proof required to

sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477.

{¶ 14} R.C. 2151.414(E) sets forth the factors relevant to determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Said section states in relevant part:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as

anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(16) Any other factor the court considers relevant.

{¶ 15} R.C. 2151.414(D)(1) sets forth the factors a trial court shall consider in determining the best interest of a child:

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## The Permanent Custody Hearing

{¶ 16} During the hearing, the trial court heard from Dr. Aimee Thomas who conducted Father's parenting/psychological evaluation, Brook Stout of Goodwill Industries, and SCJFS caseworker Kimberly Gabel.

{¶ 17} Dr. Thomas testified Father appeared to be functioning with a below average range of intellectual ability and was easily confused. She needed to take additional time with Father to make sure he understood the evaluation process. Transcript of hearing (T.) at 11. This observation was consistent with reports from the hospital regarding Father's difficulty absorbing instruction as to how to care for his child. Dr. Thomas had also evaluated mother and determined she functioned at the level of a 10-

year-old with regard to verbal skills and a 5-five-year-old in regard to non-verbal skills. T. 8. Dr. Thomas noted Father lacked insight as to mother's intellectual disabilities. He instead claimed mother caught onto things quickly, and did not recognize Mother's need for support or assistance. Given mother's pronounced deficits, Father's recognition of the same and an ability to compensate was vital. T. 11. Father was guarded, defensive, and denied any stressors, mental health symptoms, or substance abuse. He claimed he was independent, yet was not employed and lived with mother and maternal grandmother. T. 13. Based on her testing, Dr. Thomas had concerns for Father's ability to function independently and adaptively in taking care of himself let alone taking care of two young children with challenges of their own. T. 14.

{¶ 18} Dr. Thomas recommended Father participate in individual counseling and case management services in order to help him secure employment and begin functioning adaptively, perhaps with the assistance of a job coach. She further recommended Father secure employment to support his family independently, and given Mother's limitations suggested protective day care while Father worked. Additionally, Dr. Thomas recommended Father successfully complete Goodwill Parenting classes, but was skeptical as to his ability to complete the classes based on his deficits. She further questioned Father's ability to attend parenting classes consistently and on time based on his difficulties in doing the same for her parenting evaluation. T. 15-16.

{¶ 19} Brook Stout of Goodwill Industries was the parenting instructor and family coach assigned to work with the family. In-home instruction was pursued as there was a third child in the home, N.S., from a previous relationship of Mother's. T. 25. Instruction included a pretest. Both Mother and Father scored significantly lower on that test than

participants typically score. While Father appeared to take the testing seriously, he nonetheless performed poorly. T. 26-27.

{¶ 20} Stout had five meetings with parents in the home. Stout noted the overall intellectual ability of both parents was extremely limited and their behavior childlike. She noted seven-year-old N.S. was largely unsupervised, dirty, and wearing dirty, stained clothing. Ninety-year-old maternal grandmother was observed providing care to N.S. rather than parents. Stout did not believe parents could meet N.S.'s needs without grandmother's assistance. T. 30. N.S. had never seen a dentist or an eye doctor. T. 28. Part of the medical health and safety goals Stout set for parents included getting N.S. to a dentist. Parents reported they made an appointment for her, but then stated they did not. N.S. was removed from the home shortly thereafter. T. 29.

{¶ 21} Parents did not complete the program as services ceased once there were no children in the home. Stout saw no improvement in the five appointments she had with parents.

{¶ 22} Stout explained that the home-based Goodwill Parenting program is less intense than the class-based program which is four days a week for two and a half to three hours each day. T. 32. Based on her interaction with the family, her recommendation was not for a more intensive program, but rather for Parents to be evaluated by the Stark Board of Developmental Disabilities as she felt there were cognitive delays that needed to be addressed. She further recommended alternative placement for all three children so that parents could still be in the children's lives but not directly responsible for meeting their needs, and for parents to find their own independent housing. Stout testified a

demonstration of stability was a prerequisite to enrolling in the more intense parenting skills programing. T. 33.

{¶ 23} Kimberly Gabel of SCJFS testified the agency attempted to implement a safety plan after G.S. was removed from parent's custody on July 24, 2023. The plan would have involved maternal grandmother supporting parents with the care of G.S. However, maternal grandmother was neither willing nor able to complete the necessary training required before G.S. could be discharged from the hospital and released into her custody. T. 41-42. When Z.S. was born in May of 2024, it was a surprise to the Agency as parents had not disclosed Mother was pregnant. At that time, parents still had not completed their parenting assessments with Dr. Thomas. T. 43.

{¶ 24} Gabel stated there were concerns for the entire household when SCJFS became involved. A prior case worker had been trapped in the house by parents and assaulted by grandmother which triggered police involvement. N.S. witnessed the incident. There were concerns about grandmother's physical health and her ability to provide care, as well as parent's intellectual abilities.

{¶ 25} Father's case plan objectives were to complete a Lighthouse assessment and follow through with recommendations, to have safe, stable housing and a source of income, mental health treatment and follow through with comprehensive treatment, comply with the Goodwill Parenting program, and to attend medical appointments for the children. T. 46, 49.

{¶ 26} Father claimed he was on a list for subsidized housing, but Gabel was unable to verify his claim. T.63.

{¶ 27} Father failed to consistently attend medical appointments and even tried to cancel some. When he did attend, it did not appear he absorbed anything from those appointments as he failed to apply what was offered during medical appointments to his visits with the children. Father could not articulate what was happening with his children's health nor what therapies needed to take place for the children. T. 50.

{¶ 28} During visits with the children Father often fell asleep. He nearly dropped G.S. on two occasions, and failed to safely handle the children, for example, picking them up by their arms or clothing. T. 51. Parents arrived at visits unprepared. If they did bring clothing and diapers they were not the proper sizes, and brought no food, expired food, or inappropriate food for the children. It took them an unreasonable amount of time to change diapers. T. 63, 82. The visits did not improve with time and repetition of instruction. T. 58.  G.S. and Z.S. demonstrated no bond with their parents. T. 83.

{¶ 29} Father initiated mental health treatment where ongoing individual counseling and case management were recommended. He attended only two sessions of each. T. 52-53. Father reported he was employed but provided Gabel with only one paystub in October of 2024. T. 53. During one scheduled home visit with both parents Father was not present. When Gabel asked where Father was, she was told he was at work. Gabel went to Father's alleged place of employment ,but he was not there. T. 64.

{¶ 30} Father also did not successfully complete the home-based Goodwill Parenting program. Asked what parents would need to do in order to progress to the classroom-based Goodwill Parenting program, Gabel testified they needed to consistently engage in their respective comprehensive mental health treatment services,

Father needed to secure employment, and both needed to demonstrate stability in their own daily living. T. 53-54.

{¶ 31} Gabel testified that as of the date of the hearing parents had demonstrated no understanding of the needs of G.S., and N.S., could not provide an adequate and appropriate home for the children, and had not remedied the conditions that caused the removal of the children from their home. Gabel believed the agency had made reasonable efforts to arrive at a permanency plan for the children and aid parents in reunification. T. 59-60.

{¶ 32} The guardian ad litem for the children recommended permanent custody be granted to SCJFS and believed granting the agency's motion was in the best interest of the children. T. 90-91.

## Father's Arguments

{¶ 33} First, in regard to G.S, R.C. 2151.414(B)(1)(d) applies because G.S was in the temporary custody of the Agency in excess of twelve or more months of the consecutive twenty-two-month period. Father does not dispute this fact. This court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period, standing alone, is sufficient to award permanent custody. *In the Matter of A.S., V.S., and Z.S.,* 2013-Ohio-4018 (5th Dist.). Thus, whether or not Father was given an opportunity to complete the classroom-based Goodwill Parenting program would make no difference in the trial court's decision or this court's decision.

{¶ 34} In regard to Z.S., unfortunately, the evidence presented demonstrated that due to intellectual disability Father simply cannot parent independently and has no

support system to assist him in doing so, as attempts to find a support system were unfruitful. T. 55. Giving Father an opportunity to attempt class-based Goodwill Parenting would not change these facts.

{¶ 35}  Based upon the testimony presented, we find the trial court did not err in terminating Father's parental rights and granting permanent custody of the children to SCJFS. We find abundant sufficient evidence to support the trial court's decision.

{¶ 36} Father's assignments of error are overruled. The judgment of the Stark County Court of Common Pleas Family Division is affirmed.

By: King, J.

Hoffman, P.J. and

Montgomery, J. concur.